**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

EQUITABLE GATHERING EQUITY, LLC,
and EQUITABLE PRODUCTION COMPANY,

                Plaintiffs,

v.                                            CIVIL ACTION NO.  5:07-cv-00725

DYNAMIC ENERGY, INC.,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiffs' Joint Motion for Partial Summary Judgment [Docket 21].  Plaintiffs filed the instant case on November 13, 2007, alleging the following causes of action: Count I—Declaratory Judgment regarding a 12-inch natural gas pipeline; Count II—Intentional Tort for lost gas from the 12-inch pipeline; Count III—Negligence for lost gas from the 12-inch pipeline; Count IV—Declaratory Judgment regarding a 2-inch natural gas pipeline; Count V—Intentional Tort for the lost gas from the 2-inch pipeline; Count VI—Negligence for lost gas from the 2-inch pipeline; and Count VII—Injunction to prohibit Defendant from operating machinery near Plaintiffs pipelines until the pipelines are protected or relocated.  Plaintiffs seek summary judgment on Counts I and IV. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Discovery has closed and the matter is now ripe for the Court's consideration.

*I. FACTUAL BACKGROUND*

The material facts are not in dispute. Plaintiff Equitable Gathering Equity, LLC (EGE) owns and operates natural gas pipelines, including two pipelines that are at issue here. (Docket 22 at 3.) Plaintiff Equitable Production Company (EPC) produces and sells natural gas, including the gas flowing through the pipelines involved in the instant lawsuit. (*Id.*) The first pipeline (the 12-inch pipeline) is owned and operated by Plaintiffs pursuant to a Deed and Agreement of Lease dated August 7, 1946, from W. M. Ritter Lumber Company to Plaintiffs' predecessor-in-interest, Hope Natural Gas Company. (Docket 25-2.) The second pipeline (the 2-inch pipeline) is owned and operated pursuant to an Oil and Gas Lease dated October 16, 1942, between W. M. Ritter Lumber Company and Plaintiffs' predecessor-in-interest, United Carbon Company. (Docket 25-3.) Both leases provide that the coal estate, which is now owned by Defendant pursuant, is to be the dominant estate. (Docket 25-2 and 25-3.)

Both pipelines at issue are located on a tract of land, referred to by the parties as Coal Mountain, located in Wyoming County, West Virginia, where Defendant mines coal and conducts certain surface activities, including transporting coal and harvesting timber. (Docket 22 at 3-4.) On January 17, 2007, Defendant's employee, Bob Cochran, contacted Plaintiffs' Manager of Natural Resource Relations, Joe Gilmore, regarding a crossing over the 12-inch pipeline. (Docket 25 at 3.) After obtaining certain weight specifications from Mr. Cochran, Plaintiffs erected a temporary crossing over the 12-inch pipeline. (*Id.*)

On April 2, 2007, Mr. Cochran again contacted Mr. Gilmore, this time regarding the relocation of the 12-inch pipeline. (*Id.*) In response, Mr. Gilmore sent Mr. Cochran a proposed Pipeline Relocation Agreement and separate Shut In Agreement. (*Id.*) Defendant did not execute

2

either of these agreements. (*Id.*) Despite Defendant's assertion that it was no longer concerned with the relocation of the pipeline and that any action by Plaintiffs would be taken at their own discretion, Plaintiffs grew concerned with the amount of traffic on the temporary crossing. (Docket 22 at 7-8.) In the interest of safety, Plaintiffs unilaterally undertook to relocate the 12-inch pipeline at a cost of $131,672.36, plus $3,027.15 in gas lost while the line was shut off. (*Id.* at 8-9.)

On April 30, 2007, Defendant's employee, Kevin Steele, contacted Mr. Gilmore regarding the relocation of the 2-inch pipeline, which runs across the surface of the property, to facilitate Defendant's timbering operation. (Docket 25 at 4.) On August 31, 2007, Mr. Gilmore responded by sending a proposed Pipeline Relocation Agreement to Defendant. (*Id.*) Defendant did not execute the proposed agreement. (*Id.*)

Believing the 2-inch pipeline had been shut in, Defendant hired a third-party contractor, VIRCO, to initiate timbering activities near the pipeline. (*Id.*) On October 5, 2007, a bulldozer operated by VIRCO struck the pipeline and ruptured it. (*Id.*) Defendant immediately contacted Plaintiffs, who responded by stopping the gas flow in the 2-inch pipeline and shutting in the well. (Docket 22 at 10.) Plaintiffs then relocated the 2-inch pipeline so as to avoid Defendant's timbering operations at a cost of $72,533.99, plus $18,486.54 for lost gas.[1] (*Id.*) At all times, Defendant refused to pay for the cost of relocation and lost gas sustained by Plaintiffs. (*Id.* at 11.) Accordingly, Plaintiffs brought the instant lawsuit to recoup those costs.

---

[1] This amount reflects the total amount of gas lost when the pipeline ruptured, and when it was subsequently shut off for relocation.

## II. APPLICABLE LAW

### A. *Summary Judgment Standard*

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When construing such factual issues, it is well-established that the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Catrett*, 477 U.S. at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

B.     *West Virginia Substantive Law*

Federal courts sitting in diversity are to apply the common law of the state in which they sit. *See generally Erie R.R. Co. v. Thompkins*, 304 U.S. 64 (1938). Accordingly, the Court will apply the substantive law of West Virginia in this case. Plaintiffs posit that the outcome of this case is dictated by a case decided in 2001 by the West Virginia Supreme Court of Appeals, *Quintain Dev., LLC v. Columbia Natural Res., Inc.*, 556 S.E.2d 95 (W. Va. 2001). Accordingly, a thorough discussion of that case is appropriate.

In *Quintain*, the defendant, Columbia Natural Resources (CNR), owned and operated a natural gas pipeline crossing a tract of land on which the plaintiff, Quintain Development (Quintain), wished to conduct mountaintop removal mining activities. 556 S.E.2d at 97-98. The easements obtained in 1914 by CNR's predecessors-in-interest for the placement of the pipeline provided that the coal estate was to be the dominant estate and that the gas lessor would "agree[] to pay any damages which may arise . . . from the maintaining, operating and removing of [the] pipe line." *Id.* at 98. In 1995 and 1996, Quintain, fully aware of the existence of the pipeline, obtained coal leases on the tract and requested information from CNR regarding the location of any pipelines on the property. *Id.* Quintain advised CNR that one particular pipeline interfered with its proposed mining activities. *Id.* CNR offered to relocate the pipeline, but at Quintain's expense. *Id.* Quintain refused to bear that expense and instead sought an injunction requiring CNR to relocate the pipeline at its own expense. *Id.* at 98-99.

The Supreme Court of Appeals rejected Quintain's argument that the language in the deeds requiring the gas company to "pay any damages" resulting from its activities compelled CNR to bear the cost of relocation. *Id.* at 101. Specifically, the Court found that the language "addresses the

payment of *damages* sustained from CNR's operation, maintenance, and removal of the pipeline[;] [it] plainly does not contemplate which party should pay the cost of the relocation of the pipeline to facilitate coal mining on the property." *Id.* (emphasis in original). Bearing this in mind, the Court held that Quintain should bear the cost of relocation because it "knew of the existence of the pipeline when it acquired its right to mine the property [and because it] benefitted from the pipeline's relocation." *Id.* The Court concluded, "It is the [coal company] who desires to alter the status quo for its benefit . . . , and it should, therefore, be the [coal company's] obligation to pay for the achievement of its desire." *Id*. (quoting *Minard Run Oil Co. v. Pennzoil Co.*, 214 A.2d 234, 235 (Pa. 1965)).

## II. ANALYSIS

Plaintiffs contend that the facts of the instant case are nearly identical to the facts in *Quintain* and, accordingly, Defendant should bear the cost of relocation. The Court agrees. First, as in *Quintain*, the granting instruments in the instant case state that the coal estate is to be the dominant estate, but are silent regarding who should bear the cost of relocating the pipelines. Second, Defendant knew of the existence of Plaintiffs' pipelines when it acquired Coal Mountain.[2] Third, Defendant benefitted from the relocation of the pipelines. Although it later represented that it was no longer concerned with the relocation of the 12-inch pipeline, Defendant originally requested its relocation and continued to drive across the temporary crossing with heavy trucks, creating a safety hazard by the risk of a rupture or explosion. Thus, it benefitted from the relocation of the 12-inch pipeline by avoiding this potential danger. Likewise, it benefitted from the relocation of the 2-inch

---

[2] At his deposition, Bob Cochran, an employee of Defendant, testified: "Q: . . . You knew of the existence of pipelines that ran across the property when you acquired it, correct? A: Yes." Docket 22-7 at 7.

6

pipeline—which actually did rupture as a result of VIRCO's timbering activities—by avoiding further risk of rupture or explosion. Finally, Defendant altered the status quo. Although there is no evidence in the record regarding the exact time the pipelines were placed on the property, they had clearly been there for some time before Defendant began its surface activities that necessitated their relocation. Taking these considerations together, it is clear that, like *Quintain*, the coal company should bear the cost of the relocation.

Defendant puts forth a number of arguments in an attempt to distinguish *Quintain* and avoid summary judgment. First, Defendant contends that a genuine issue of material fact exists based on its representation to Plaintiffs that the relocation of the pipelines was no longer its concern. Second, it argues that the August 7, 1946, Lease Agreement required Plaintiffs to place any pipelines at a depth so as not to interfere with Defendant's mining activities. Third, it posits that the language of the granting instruments requires Plaintiffs to bear any cost of relocation. Fourth, it argues that Plaintiffs assumed the risk of bearing the cost when they unilaterally undertook to relocate the pipelines. Finally, Defendant attempts to distinguish *Quintain*. The Court will address each argument in turn.

### A.   *Genuine Issue of Fact*

Defendant asserts that its representation to Plaintiffs that it "was no longer concerned with nor would it require the relocation of the 12-inch pipeline and that any action taken by Plaintiffs with regard to that pipeline [would be] at their own discretion," (Docket 25 at 3-4), creates a genuine issue of material fact. Plaintiffs call this argument a "red herring." (Docket 26 at 9.) By the time Defendant made this representation, Plaintiffs argue, the status quo had already been altered by the placement of the temporary crossing and the heavy volume of traffic using it. Finally, Plaintiffs

7

contend that Defendant made the representation simply because it believed it would not have to pay for any relocation.[3]

Defendant's purported belief that the pipeline did not need to be relocated or that it would not have to pay for the relocation does not create an issue of fact.[4] Rather, as Plaintiffs point out, Defendant had already changed the status quo by requesting the temporary crossing and placing an extraordinary burden on the crossing by driving heavy trucks over it multiple times a day. It could not then avoid the known safety concern by claiming that it was no longer "concerned with" the relocation of the pipeline. Moreover, regardless of Defendant's lack of "concern" regarding the pipeline, Defendant is the party that ultimately benefitted from the relocation because it avoided any potential dangers that resulted from its surface activities. Thus, Defendant's representation to Plaintiff is immaterial and its argument on this point must fail.

### B. *Pipeline Depth Requirement*

Defendant next argues that the August 7, 1946 Deed and Lease Agreement contained language that required Plaintiffs to maintain any pipelines at a depth so as not to interfere with the coal estate.[5] It posits that Plaintiffs' relocation of the pipeline because it posed a safety hazard proves that the pipeline was not maintained at an adequate depth. Plaintiffs contend that

---

[3] In support of this contention, Plaintiffs point to Bob Cochran's deposition, wherein he testified that the Pipeline Relocation Agreement was not executed because Defendant "believe[d] that they had found a way to make the . . . relocation . . . of the line Equitable's responsibility." Docket 21-6 at 15.

[4] Such an argument would be akin to a citizen mailing the Internal Revenue Service a letter stating that he did not believe he would have to pay his taxes. A subjective belief, no matter how strongly it is held, can not alter or negate a legal duty.

[5] This language provides: "The said pipe line shall be laid at such depths as not to be disturbed by cultivation and other uses of the surface of the land." Docket 25-2 at 11.

Defendant's argument should fail for two reasons: first, the use of heavy coal-hauling equipment such as that used by Defendant was not anticipated by the 1946 lease, and second, Defendant removed a substantial amount of material covering the pipeline before the crossing was erected.

It is important to note that Defendant makes this argument only as to the 12-inch pipeline. Although Plaintiffs' argument that the 1946 agreement could not have contemplated the use of 275-ton trucks to haul coal across the surface is compelling, they do not present any evidence to support it. As such, a bald assertion that such technology was not in existence in 1946 cannot carry the day. Thus, Plaintiffs must rest on their argument that the pipeline was adequately buried before Defendant removed material to construct a road. In support of this argument, Plaintiffs refer again to the deposition testimony of Bob Cochran: "Q: . . . Was the 12 inch pipeline buried deeper in 2005 before everything was removed . . . than it was buried before Equitable was approached about needing a crossing? A: I would have to say yes." (Docket 21-7 at 9.) Defendant, on the other hand, has put forth no evidence to negate this testimony. Rather, it relies on the unsupported allegation that the pipeline was not adequately buried and the fact that the pipeline posed a safety hazard at the time the crossing was erected. Because it has not shown that the line was improperly buried before it began its operations, Defendant has not established a genuine issue of fact for trial, and its argument on this point must fail as well.

### C. *Language of the Granting Instruments*

Defendant argues that, pursuant to the October 16, 1942, Oil and Gas Lease and the August 7, 1946, Lease Agreement, it is not liable for any damage caused by its lawful timbering and mining activities. Under the 1942 agreement, Defendant is not "liable . . . for injuries or damages sustained . . . by reason of the logging, lumbering or sawmilling operations." (Docket 25-3 at 8.) Under the

9

1946 agreement, Defendant "shall [not] be liable . . . for injuries or damages sustained by reason of the breaking of strata, subsidence of the surface, or other results of the mining of coal . . . or any other lawful use."  (Docket 25-2 at 12.)  Plaintiffs submit that this argument was expressly foreclosed by the West Virginia Supreme Court of Appeals in *Quintain*.  The Court agrees.

In *Quintain*, the coal lessee made a similar argument, that CNR was required to pay for "any damages which may arise from the maintaining, operating, and removing" of the pipeline.  556 S.E.2d at 101 (quoting the applicable deed).  The Court there held that damages, as contemplated by the deed, does not address "which party should pay the cost of the relocation of the pipeline to facilitate coal mining on the property."  *Id.*  The same is true here.  The damages referred to in the 1942 and 1946 instruments are directed at incidental damages that result from the ordinary activities of coal mining and timbering.  The relocation of a pipeline is not the type of damage contemplated by this language, and it is certainly not *caused by* coal mining or timbering in the sense that the term is used here.[6]  Thus, the language is inapplicable here as well.  Moreover, just as in *Quintain*, the granting documents are silent as to who must bear the cost of relocating gas pipelines.  Accordingly, Defendant's argument on this point is without merit.

### D. *Assumption of the Risk*

Defendant also argues that Plaintiffs should be barred from recovery based on the doctrine of assumption of the risk.  Specifically, it posits that Plaintiffs assumed the risk of bearing the cost of relocation when they relocated the pipelines after being told by Defendant that it was no longer

---

[6] Defendant does not make the argument that the rupture of the 2-inch pipeline was "damage" caused by its timbering activities and thus protected under the 1942 agreement. Rather, it makes the argument that the language in that agreement prevents it from incurring relocation costs. The distinction is important, and will be addressed in greater detail when damages are addressed.

concerned with relocation and that it would refuse to sign the Pipeline Relocation Agreements. In support of this argument, Defendant cites to *Hunn v. Windsor Hotel Co.*, 193 S.E. 57, 58 (W. Va. 1937), in which the West Virginia Supreme Court of Appeals held: "The doctrine [of assumption of the risk] rests on two premises: First, that the nature and extent of the risk are fully appreciated; and, second, that it is voluntarily incurred." Defendant maintains that both elements have been met here. Plaintiffs argue that applying such a doctrine would make for poor public policy wherein a party, in an attempt to avoid payment, would have to obtain payment or a court ruling before it acted to remedy a potential safety hazard.

Plaintiffs' policy argument aside, Defendant misses the mark on this issue. "Assumption of the risk is a doctrine associated with common law tort liability." *Hopkins v. Jordan Marine, Inc.*, 271 F.3d 1, 3 (1st Cir. 2001). Even the case to which Defendant cites, *Hunn*, recognizes the close relationship the doctrine has to contributory negligence: "The doctrines of contributory negligence and of assumption of risk are not identical, yet the distinction between them has not always been closely observed in our opinions." 193 S.E. at 58. Defendant cites no law for the proposition that assumption of the risk should apply to a case such as this that involves no common-law negligence, but a declaratory judgment construing the language of gas leases. Accordingly, the Court finds that assumption of the risk is inapplicable to the instant case, and Defendant's argument on this point must fail.[7]

---

[7] The Court has already discussed, *supra*, the effect of Defendant's lack of "concern" regarding the relocation on Plaintiffs' showing that no genuine issue of fact exists. Essentially, this point boils down to the policy that a party not be able to avoid liability for a legal duty by purporting to disclaim it rather than by acting to remedy a known danger.

11

### E. *Distinguishing* Quintain

Finally, Defendant attempts to distinguish *Quintain*. In so doing, it states that "Plaintiffs . . . had knowledge at the time they acquired the right to install and use pipelines that . . . Defendant[] would be conducting mining activities on the property." (Docket 25 at 9.) It also states that "Plaintiffs stood to benefit from the relocation of the pipelines more than Defendant [because they] would be responsible for any damages[,]" and because relocation would "eliminat[e] any incident for which they would be held accountable." (*Id.*)

As noted above, it is undisputed that Defendant knew about the pipelines when it purchased the property. (*See* Docket 22-7 at 7.) Defendant puts forth no evidence to rebut this showing, and its bald assertions to the contrary are not sufficient to avoid summary judgment. Moreover, the argument that Plaintiffs would benefit from the relocation is circular—Defendant cannot claim that *Quintain* does not apply because Plaintiffs would have had to pay in the first place, especially where the agreement is silent on that issue. As Plaintiffs point out, they were satisfied with the status quo. Defendant necessitated the relocation of the pipeline when it removed material from on top of the pipeline and built a temporary crossing over which it drove a heavy volume of coal trucks. Thus, it received the benefit of avoiding a potential rupture or explosion caused by that activity.

To reiterate, *Quintain* requires that, where the applicable agreements are silent as to which party bears the cost of relocating natural gas pipelines, the cost falls on the party that knew of the existence of the pipelines, altered the status quo, and seeks to benefit from any relocation. In this case, Defendant meets all three of those criteria. Based on its arguments above, Defendant is unable to distinguish *Quintain*, and Plaintiffs are accordingly entitled to a judgment as a matter of law.

*IV. CONCLUSION*

Based on the foregoing analysis, Plaintiffs' Joint Motion for Partial Summary Judgment [Docket 21] is **GRANTED** in part, as it relates to Counts I and IV—Plaintiffs' request for a declaratory judgment finding that Defendant is responsible for the costs of relocation of the two pipelines. This decision therefore results in a partial judgment in favor of Plaintiffs in the amount of $131,672.36. The Court is unclear as to how or whether its ruling applies to the gas lost as a part of the relocation process or the damage done to Plaintiffs' pipeline by the contractor of the Defendant. Accordingly, it is hereby **ORDERED** that this Court will conduct a telephonic status conference with counsel on **January 22, 2009, at 11:00 a.m.**, to discuss the status of the remaining issues, if any, at that time. Lead counsel for Plaintiffs shall arrange the conference call to the Court. The Pretrial Conference scheduled for **January 8, 2009, at 9:00 a.m.** and the Trial scheduled for **January 20, 2009, at 9:00 a.m** are **CANCELLED**.

A separate Partial Judgment Order will enter this day implementing the rulings contained herein.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:     January 7, 2009

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE